**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRIC OF ARKANSAS**
**JONESBORO DIVISION**

**RIDGEFIELD CHRISTIAN SCHOOL, INC.**                                  **CHAPTER 11**
**FED. ID NO. 71-0739822**                                             **CASE NO. 3:15-BK-10029**

**DEBTOR'S DISCLOSURE STATEMENT TO ACCOMPANY**
**ITS PLAN OF REORGANIZATION DATED AS OF MAY 28, 2015**

> **THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

The Debtor, Ridgefield Christian School, Inc. (hereinafter referred to as the Debtor) in accordance with the provisions of 11 U.S.C.§1129(a)(11), filed a voluntary Chapter 11 on January 5, 2015 with the United States Bankruptcy Court, Eastern District of Arkansas. Since the Petition Date, the Debtor has remained in possession of its assets and has continued to own, operate and manage its business affairs pending the approval of a Plan of reorganization in accordance with the provisions of Title 11 of the United States Code (the "**Bankruptcy Code**").

Pursuant to Section 1125 of the Bankruptcy Code, the Debtor now files this Disclosure Statement (the "**Disclosure Statement**") relating to its proposed Plan of Reorganization dated May 28, 2015 (the "**Plan**").[1]

No representations concerning the Debtor, the estimated value of the Debtor's property and/or the estimated assets to be generated from the liquidation of the Debtor's assets, are authorized by the Debtor other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance which are other than as contained in this Disclosure Statement, should not be relied upon by you in casting your vote with respect to the proposed Plan.

The Debtor believes that the Plan provides the greatest and earliest possible recoveries to all creditors under the circumstances. The debtor therefore believes that acceptance of the Plan is

---

[1] Capitalized terms not otherwise defined herein shall have the meaning given to such terms in the Plan.

in the best interest of each and every class of creditors and recommends that you vote to accept the Plan.

This Disclosure Statement is based upon information available to the Debtor as of May 28, 2015, and does not reflect events that may occur subsequent to that date, which may have a material impact on the information contained in this Disclosure Statement. The Debtor will not make any effort to supplement or amend this Disclosure Statement to reflect changes subsequent to the date hereof.

This document was compiled from information obtained by the debtor from numerous sources believed to be accurate to the best of the debtor's knowledge, information and belief. However, the debtor and its advisors do not represent or warrant that this Disclosure Statement is complete or that the information contained herein is free from any inaccuracy or omission.

Nothing in this disclosure statement is or shall be deemed to be an admission or a declaration against interest by the debtor for purposes of any existing or future litigation, but rather as statements made in settlement negotiations governed by rule 408 of the Federal Rules of Evidence and any other statute or rule of similar import.

## CAUTIONARY STATEMENT

Certain information included in this Disclosure Statement contains forward-looking statements within the meaning of the securities act of 1933, as amended, the securities exchange act of 1934, as amended, and the private securities litigation reform act of 1995, as amended. Such forward-looking information is based on information available when such statements are made and is subject to risks and uncertainties that could cause actual results to differ materially from those expressed in this Disclosure Statement.

## THE DEBTOR AND ITS OPERATIONS

### 1. Introduction and Reason for Filing Chapter 11

Ridgefield Christian School was envisioned by a concerned group of Christian parents. Planning committees began meeting in August of 1992 and the first classes were held in August of 1993. The primary goal of this new school was to provide a setting where children could grow in their knowledge of God, develop Christian character, and achieve academic excellence.

During the first several years, the school was housed in church facilities in Jonesboro. The school's enrollment started with 92 students and enrollment steadily increased for the next several years. It quickly became apparent that Ridgefield needed its own facilities. In August of 1995 Ridgefield Christian School obtained a loan through a local bank for $1,500,000.00 and construction began on improvements to serve as a school located on 26.28 acres in Craighead County, Arkansas, located at 3824 Casey Springs Rd., Jonesboro, Arkansas 72404 (the "**Facility**").

On November 1, 2002, Craighead County Public Facilities Board, as issuer (the "**Issuer**"), made three separate loans to the Debtor in the aggregate amount of $2,465,000.00 (the "**Loan**"), for the purpose of providing the Debtor with funds to finance or refinance a portion of the costs of construction and equipping of the Facility. For the purpose of making the Loan to the Debtor, the Issuer issued the Craighead County Public Facilities Board Refunding and Capital Improvement Bonds (Ridgefield Christian School, Inc. Project), Series 2002A, Cusip Nos. 224222 AC3, 224222 AD1, 224222 AE9 and 224222 AF6 (the "**Series 2002A Bonds**"), Craighead County Public Facilities Board Refunding and Capital Improvement Bonds (Ridgefield Christian School, Inc. Project), Series 2002B, Cusip No. 224222 AG4 (the "**Series 2002B Bonds**"), and Craighead County Public Facilities Board Refunding and Capital Improvement Bonds (Ridgefield Christian School, Inc. Project), Series 2002C (the "**Series 2002C Bonds**" collectively with the 2002A Bonds and 2002B Bonds, the "**Bonds**") to certain bondholders, of which First Security Bank ("**FSB**") was appointed as the trustee for the holders of the Bonds (collectively, the "**Bondholders**"). The Series 2002C Bonds have since been retired and extinguished. For the purpose of setting forth the terms and conditions of the Bonds and the rights and obligations of the Issuer and FSB, as Trustee for the Bondholders, the Issuer and FSB, as Trustee for the Bondholders, executed that certain Trust Indenture, dated November 1, 2002.

The obligations and indebtedness of the Debtor under the Loan are evidenced by that certain Loan Agreement, dated November 1, 2002, by and between the Issuer and Debtor (the "**Loan Agreement**") and three separate Promissory Notes, each dated November 1, 2002, stating an aggregate original principal balance of $2,465,000.00, and which were executed by the Debtor in favor of Issuer (collectively, the "**Note**").

The Note requires the Debtor to make monthly payments of principal and accrued but unpaid interest, as set forth in Note, with the balance of all principal and accrued but unpaid interest due at the maturity of the Loan.

The obligations and indebtedness of the Loan, as evidenced by the Note and the Loan Agreement, are secured by a mortgage lien on the Facility and all other Mortgaged Property (as defined in the Mortgage). Such lien is evidenced by a certain First Mortgage With Security Agreement and Assignment of Rents and Leases (Includes Fixture Filing Under Uniform Commercial Code), dated November 1, 2002, and granted by the Debtor in favor of the Issuer, and which was recorded on November 15, 2002, in the Office of the Circuit Clerk and Ex-Officio Recorder of Craighead County, Arkansas, in Mortgage Book 944, Page 893-924 (the "**Mortgage**"), encumbering the Facility and the additional Mortgaged Property,[2] as defined and described in the Mortgage. (The Indenture, Note, Mortgage, and any and all documents associated with the Loan, are collectively referred to herein as the "**Loan Documents**").

In addition to imposing a lien against the Facility and other Mortgaged Property, the Mortgage provides that "[a]ll of the rents, royalties, bonuses, issues, profits, revenue, income, deposits, escrow accounts and other benefits derived from the Mortgaged Property . . . are hereby absolutely and unconditionally assigned to [Issuer], to be applied by [issuer] in payment of the Obligations."

Among other things, pursuant to the Indenture, the Issuer assigned to FSB, as the Trustee for the Bondholders, all of its right, title, and interest in and to the Loan Documents, including, without limitation, all of the liens, security interests, assignments, and other rights under the Mortgage and rights to payment under the Note.

During the subsequent several years following the bond issue, Ridgefield's enrollment continued to increase. During the 2007-2008 school year the school reached its highest enrollment with 355 students. However, enrollment began a steady decline after the 2008-2009 school year. Ridgefield conducted exit interviews as families began not re-enrolling and found that the vast majority of families were leaving due to financial reasons. The 2008 recession was the reason that many of our families could no longer afford Ridgefield. Since 2008, the school's enrollment has continued a steady decrease with this year's enrollment being only 201.

---

[2] The Mortgaged Property includes, among other things, all of the improvements located on the Real Property, all of the income, rents, issues, and profits arising from the Real Property and improvements, all materials, equipment, and furnishings, and all other property installed on or used in and about the Real Property and the improvements thereon.

Ridgefield Christian School operates solely from tuition fees and donations. The school has tried many avenues to increase donations as well as enrollment, but to no avail.

Despite the school's financial woes, the students have continued to excel both academically and spiritually. The school's standardized testing scores rank well above state and national averages, including the ACT scores. On average, students at Ridgefield are awarded $44,000.00 each in college scholarships with over 95% of the graduates going on to pursue higher education.

Before beginning the 2013-2014 school year, the school's administration began looking for ways to cut back payroll expenses. The net result was a reduction of teachers and administration expense by $66,874.83. Because of the ability to cut back the number of faculty and staff personnel, as well as receiving five (5) foreign exchange students which brought the school an additional $50,000.00, Ridgefield was able to make it through that school year, despite the decrease in enrollment. When beginning this school year (2014-2015), it was apparent to the administration that the ability to cut additional personnel was not feasible if the school wished to maintain the level of education excellence that the school had worked so hard to achieve. Foreign exchange students that the school was hoping for this year did not materialize as well. It is because of these factors, along with the decreased enrollment, that Ridgefield was forced to seek relief from the monthly debt service payments of $15,405.21.

The school board began the process of seeking relief for the debt service payments in July of 2014. Several board members met with bond counsel in an effort to work out a solution but those attempts proved unsuccessful. Ridgefield was forced to cease making the debt service payments in October 2014 in order to ensure that the current year payroll contracts could be fulfilled. Ridgefield Christian School is making every effort to ensure that the school continues to operate while the search for a solution to our debt continues.

History of enrollment/tuition revenue/debt service paid:

| SCHOOL YEAR | ENROLLMENT | TUITION AND FEES REVENUE | DEBT SERVICE PAID |
|---|---|---|---|
| 2002/2003 | 213 | $728,189.00 | $105,683.43 |
| 2003/2004 | 248 | $959,325.00 | $160,605.84 |
| 2004/2005 | 299 | $950,688.00 | $159,305.88 |
| 2005/2006 | 316 | $927,820.00 | $161,699.20 |
| 2006/2007 | 342 | $1,086,998.00 | $161,489.16 |
| 2007/2008 | 355 | $1,139,653.00 | $160,164.20 |

| | | | | |
|---|---|---|---|---|
| 2008/2009 | 334 | $1,231,530.00 | | $162,322.56 |
| 2009/2010 | 298 | $1,216,438.00 | | $162,657.56 |
| 2010/2011 | 307 | $1,222,832.00 | | $161,247.56 |
| 2011/2012 | 256 | $1,170,209.00 | | $163,170.84 |
| 2012/2013 | 231 | $1,091,563.00 | | $176,604.20 |
| 2013/2014 | 208 | $997,220.00 | | $184,149.20 |
| | | | TOTAL | $1,919,099.63 |

## PLAN OF REORGANIZATION

The following is a summary of the Plan of the Debtor. If any discrepancy appears between the Plan and this Disclosure Statement, the Plan will control. In this regard, a full and complete copy of the Plan is annexed hereto as **Exhibit "A"** and is incorporated herein by reference. Specific attention should be given to the **Article IX**, entitled **DISCHARGE, RELEASES, INJUNCTION, AND INDEMNIFICATION**, which sets forth the scope of releases, injunctions, and exculpations provided by the Plan to and in favor of the Debtor, FSB, as Trustee for the Bondholders, and others.

All Claims or interests are placed in a particular Class as set forth below. A Claim or interest is placed in a Class only to the extent that the Claim or interest falls within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or interest falls within the description of such other Class or Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

**Treatment of Class 1 Claims (Allowed Series 2002A Bonds).**

Each holder of an Allowed Series 2002A Bond shall have its Bond Claim Allowed in an amount equal to all of its respective unpaid principal and accrued but unpaid interest, which in the aggregate for all Allowed Series 2002A Bonds is in the amount of $1,918,840.00. The Allowed Series 2002A Bonds shall be paid pursuant to the terms and conditions of the New Bond Documents which shall be amended and modified, to the extent necessary, to reflect the following terms of repayment:

    a.    Months 1-36, interest on the Allowed Series 2002A Bonds shall accrue at the rate of 2% and be paid by the Debtor to the Bond Trustee on a monthly

6

      basis, which the Bond Trustee shall remit to the third party responsible for distributing payments under the Bonds to the holders thereof on a semi-annual basis.

    b. Months 37 through May 1, 2039, interest on the Allowed Series 2002A Bonds shall accrue at the rate of 3% and the Debtor shall make monthly payments to the Bond Trustee, which the Bond Trustee shall remit to the third party responsible for distributing payments under the Bonds to the holders thereof on a semi-annual basis, of accrued but unpaid interest and principal (the principal on the Effective Date being equivalent to the amount of the Allowed Series 2002A Bonds) shall be amortized such that the Allowed Series 2002A Bonds shall be fully repaid by maturity, such monthly payments to the Bond Trustee being in the amount of $10,243.27.

    c. The Surplus Revenues of the Debtor shall be used to first replenish the Debt Service Reserve Fund to an amount equal to the Debt Service Reserve Fund Cap, which such Debt Service Reserve Fund shall continue to be governed by and made subject to the terms and conditions of the New Bond Documents. Upon the funding of the Debt Service Reserve Fund in an amount equal to the Debt Service Reserve Fund Cap, the Surplus Revenues shall be used to redeem the Allowed Series 2002A Bonds, in whole or in part, at a redemption price equal to the principal amount being redeemed plus accrued interest to the redemption date.

The Allowed Series 2002A Bonds shall retain the pre-petition liens and security interests securing the Allowed Series 2002A Bonds as set forth in, described, granted, or reaffirmed by the New Bond Documents and New Security Documents and the Allowed Series 2002A Bonds shall continue to be governed by the terms, conditions, covenants, representations, and warranties set forth in the New Bond Documents. Class 1 is impaired by the Plan and the holders of Allowed Class 1 Claims are entitled to vote to accept or reject the Plan.

Pursuant to and in accordance with the New Bond Documents, the legal fees, expenses, costs, and other charges of the Bond Trustee shall be paid from the proceeds in the Debt Service Reserve Fund upon the Effective Date.

**Treatment of Class 2 Claims (Allowed Series 2002B Bonds).**

Each holder of an Allowed Series 2002B Bond shall have its Claim Allowed in an amount equal to all of its respective unpaid principal and accrued but unpaid interest, which in the aggregate for all Allowed Series 2002A Bonds is in the amount of $232,031.25. The Allowed Series 2002B Bonds shall be paid pursuant to the terms and conditions of the New Bond Documents which shall be amended and modified, to the extent necessary, to reflect the following terms of repayment:

    a.    Months 1-36, interest on the Allowed Series 2002B Bonds shall accrue at the rate of 2% and be paid monthly by the Debtor, which the Bond Trustee shall remit to the third party responsible for distributing payments under the Bonds to the holders thereof on a semi-annual basis.

    b.    Months 37 through May 1, 2039, interest on the Allowed Series 2002B Bonds shall accrue at the rate of 3% and the Debtor shall make monthly payments to the Bond Trustee, which the Bond Trustee shall remit to the third party responsible for distributing payments under the Bonds to the holders thereof on a semi-annual basis, of accrued but unpaid interest and principal (the principal on the Effective Date being equivalent to the amount of the Allowed Series 2002B Bonds) shall be amortized such that the Allowed Series 2002B Bonds shall be fully repaid by maturity, such monthly payments to the Bond Trustee being in the amount of $1,238.64.

    c.    The Surplus Revenues of the Debtor shall be used to first replenish the Debt Service Reserve Fund to an amount equal to the Debt Service Reserve Fund Cap, which such Debt Service Reserve Fund shall continue to be governed by and made subject to the terms and conditions of the New Bond Documents. Upon the funding of the Debt Service Reserve Fund in an amount equal to the Debt Service Reserve Fund Cap, and after the redemption or payment in full of the Allowed Series 2002A Bonds, the Surplus Revenues shall be used to redeem the Allowed Series 2002B Bonds, in whole or in part, at a redemption price equal to the principal amount being redeemed plus accrued interest to the redemption date.

The Allowed Series 2002B Bonds shall retain the pre-petition liens and security interests securing the Allowed Series 2002B Bonds as set forth in, described, granted, or reaffirmed by the

New Bond Documents and New Security Documents and the Allowed Series 2002B Bonds shall continue to be governed by the terms, conditions, covenants, representations, and warranties set forth in the New Bond Documents. Class 2 is impaired by the Plan and the holders of Allowed Class 2 Claims are entitled to vote to accept or reject the Plan.

Pursuant to and in accordance with the New Bond Documents, the legal fees, expenses, costs, and other charges of the Bond Trustee shall be paid from the proceeds in the Debt Service Reserve Fund upon the Effective Date.

**Treatment of Class 3 Claims (Allowed General Unsecured Claims).**

Gym Masters - $4,500.00. This Allowed Claim will be paid in full by a $2,500.00 commitment from Focus Bank. The remainder to be paid by P.A.C.E., a parent fund similar to the school's PTA. Since there is currently $6,202 on hand in the P.A.C.E. account, Debtor proposes to pay this debt in full on the Effective Date. Class 3 is unimpaired by the Plan.

**LIQUIDATION SCENARIO**

The Debtor believes this Plan gives creditors the best opportunity to receive the greatest dividend, as it allows the Debtor to continue operating the school at the Facility as a going concern. As usual in these circumstances, conversion of the case to a chapter 7 liquidation would cause the school operated at the Facility to shut down, resulting in the loss of tuition revenue available to operate the Facility as a going concern and pay the ongoing and reoccurring expenses at the Facility. In this circumstance, unless the Chapter 7 trustee reasonably believed that the Facility could be sold for more than the total indebtedness represented by the Bonds plus transaction costs, the trustee would likely allow FSB, as Trustee for the Bondholders, to exercise its rights and remedies under the Loan Documents, including, without limitation, the foreclosure of its interests in the Mortgage. In this circumstance, FSB, as Trustee for the Bondholders, would be required to incur the costs associated with holding and maintaining the Facility pending the ultimate disposition thereof. Because of the size and intended use of the Facility, the time period required to maximize the sale price for the Facility is uncertain and unknown. Furthermore, the sales price that could be obtained for the Facility is unknown and speculative and is largely dependent on a buyer finding the Facility suitable to its needs and intended use. In this regard, the Debtor obtained an appraisal of the Facility dated December 16, 2014, in which the Facility was valued at $1,181,000. FSB obtained an appraisal of the Facility dated March 3,

2015, in which the Facility was valued at $3,200,000.00. The discrepancy between these two appraisals exhibits the uncertainty regarding the value obtained for the Facility in the event the school were shut down and the Facility liquidated.

In light of that certainty, the Debtor believes that the treatment afforded to Allowed Claims in the Plan is in the best interests of the Debtor's creditors.

Exhibit "D" to the Plan of Reorganization describes liquidation values.

## MATTERS TO CONSIDER BEFORE VOTING ON THE PLAN

A.   **Alternatives to the Plan.**

Although this Disclosure Statement is intended to provide information to assist Creditors in deciding whether to accept the Plan, a brief discussion of the alternatives to the Plan may be useful. These other alternatives include (i) continuation of the Bankruptcy Case, (ii) immediate liquidation of the Debtor through conversion of the Bankruptcy Case to a Chapter 7 Case, (iii) filing alternative plans under Chapter 11, or (iv) dismissal of this Bankruptcy Case. The Debtor believes the proposed Plan to be in the best interests of Creditors, and do not favor any alternative to the proposed Plan. In arriving at this conclusion, the Debtor has assessed the alternatives to the Plan as follows:

1. **Conversion to a Chapter 7 Liquidation**. Section 704 of the Bankruptcy Code requires a chapter 7 trustee to "collect and reduce to money the property of the estate for which such trustee serves and close such estate as expeditiously as is compatible with the best interest of the parties in interest."

2. **Alternative Plan Under Chapter 11**. At this time, the Plan proposed by the Debtor is the only plan of reorganization that has been filed in these Bankruptcy Case. Notwithstanding, it is possible that another creditor, or party-in-interest may file and attempt to prosecute their own plans of reorganization. Even if another plan of reorganization is filed, the Debtor believes that its Plan represents the best alternative for creditors, especially since it includes the Secured Creditor Settlement.

3. **Dismissal of the Bankruptcy Cases**. Dismissal of the Bankruptcy Case would also lead to an unsatisfactory result. Holders of Claims and Interests must be dealt with and a bankruptcy Cases is viewed as the most efficient means to accomplish an orderly reorganization of the Debtor.

**B. Risk Factors.**

HOLDERS OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH) PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.

    1.    Bankruptcy Risks.

        a.  Non-confirmation of the Plan. Even if all Classes of Claims that are entitled to vote accept the Plan, the Plan might not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor, and that the value of distributions to dissenting creditors and equity security holders not be less than the value of distributions such creditors and equity security holders would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. The Debtor believes that the Plan satisfies all the requirements for confirmation of a plan of reorganization under the Bankruptcy Code. There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for confirmation of the Plan have been satisfied.

        b.  Non-occurrence of Effective Date of the Plan. Even if all Classes of Claims that are entitled to vote accept the Plan, the Effective Date may not occur. The Plan sets forth conditions to the occurrence of the Effective Date of the Plan which may not be satisfied. The Debtor believes that they will satisfy all requirements for consummation required under the Plan. There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for consummation of the Plan have been satisfied.

## OTHER FINANCIAL INFORMATION

Cash flow data and the past twelve months' income and expenses are attached as exhibits to the accompanying Plan of Reorganization.

H

    Ridgefield Christian School, Inc.

  James F. Dowden, P. A.


/s/ James F. Dowden
James F. Dowden  (#77046)
212 Center St.; 10th Floor
Little Rock, AR 72201
(501) 324-4700  Phone
(501) 374-5463  Fax
jfdowden@swbell.net